**Elmonia BETTS–LUCAS, Respondent,**

v.

**Michael HARTMANN, Appellant.**

**No. WD 60363.**

Missouri Court of Appeals,
Western District.

July 30, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 2002.

Application for Transfer Denied
Nov. 26, 2002.

---

Jeremiah W. (Jay) Nixon, Atty. Gen., Robert Presson, Office of Attorney General, Jefferson City, for appellant.

Andrew Haynes McCue, Kansas City, for respondent.

RONALD R. HOLLIGER, Judge.

This appeal involves a complicated factual and procedural tale, beginning with the death of a mental patient, leading to criminal charges, a wrongful death action, and multiple declaratory judgment actions involving the obligation of the State to indemnify for the actions of its employee.

The Missouri Commissioner of Administration ("Commissioner") appeals a summary judgment finding that the Legal Expense Fund, § 105.711, et seq., RSMo. 2000,[1] provides coverage for the wrongful death of Walter Betts ("Walter") while a patient at Higginsville Habilitation Center, a facility operated by the Missouri Department of Mental Health. Walter died on April 2, 1995, after being struck on the throat by a state employee, Rick Hartgrave ("Hartgrave"). Later in the morning after the incident Walter had problems eating and drinking. The nurse was not told of the trauma to Walter's throat and believed that the swelling observed was not significant. Death resulted from asphyixation from an undiagnosed fractured larynx caused by trauma. Hartgrave was subsequently criminally charged and pled guilty to involuntary manslaughter, § 565.024, RSMo.

Walter's sister, Elmonia Betts–Lucas ("Betts–Lucas") subsequently filed, in Lafayette County, a civil action for wrongful death naming Hartgrave as a defendant.[2] The Missouri Attorney General did not provide a defense to Hartgrave but instead filed, in Henry County, a declaratory judgment action on behalf of the Commissioner, seeking a finding that Hartgrave was entitled to neither representation nor coverage under the Legal Expense Fund for the action in Lafayette County. Betts–Lucas was not included as a party by the Attorney General in that action.

While the Henry County action was pending, Hartgrave entered into a Covenant Not to Execute with Betts–Lucas, isolating his personal assets[3] from responsibility for any judgment obtained in the wrongful death action. At a non-jury trial, at which neither Hartgrave nor the Attorney General appeared, the Lafayette County Circuit Court entered a judgment for $302,668.15 in compensatory damages and $500,000 in damages for aggravating circumstances.[4] Meanwhile, Betts–Lucas filed a second declaratory judgment action in Cole County, seeking coverage for the wrongful death judgment from the Legal Expense Fund. While that action pended, but after the judgment in the wrongful death action, the Commissioner received a judgment from Henry County declaring that Hartgrave's conduct was outside the scope of coverage under the Legal Expense Fund.

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. Other defendants were subsequently dismissed.

3. Except for $500 paid as consideration for the covenant.

4. Pursuant to RSMo § 538.205(4) governing actions against health care providers, the actual damages were itemized by category and then subjected to the cap limitations of § 538.215.

To complicate this procedural history even further, the Commissioner received a summary judgment in his favor in the Cole County declaratory judgment action holding that the Fund owed no coverage. Because that judgment was granted while the court was considering Betts–Lucas' motion for summary judgment and the Commissioner had filed no counter-motion, we reversed in the first appeal in this case, *Betts–Lucas v. Hanson*, 31 S.W.3d 484 (Mo.App.2000). After remand, Betts–Lucas renewed her motion for summary judgment and the Commissioner filed a counter-motion, as well. The parties also filed a joint stipulation of facts for the court to consider. The Cole County Circuit Court then granted the summary judgment in favor of Betts–Lucas that is the present subject of appeal.

## I. STANDARD OF REVIEW

■■■ Our review of a grant of summary judgment is essentially *de novo*. *Younger v. Mo. Pub. Entity Risk Mgmt. Fund*, 957 S.W.2d 332, 335 (Mo.App.1997). The facts and evidence are viewed in the light most favorable to the non-moving party, here the Commissioner, who is also given the benefit of all reasonable inferences from the facts. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). To prevail on a motion for summary judgment, the movant must show that there is no dispute of material fact and that she is entitled to judgment as a matter of law. *Younger*, 957 S.W.2d at 335. When, as here, the matter has been submitted to the court purely upon a joint stipulation of facts, the question is not only whether Betts–Lucas is entitled to judgment as a matter of law but also whether as a matter of law she has overcome the affirmative defenses advanced by the Commissioner.[5] *See Rodgers v. Threlkeld*, 22 S.W.3d 706, 710 (Mo.App.1999). If the facts, viewed in such a manner, do not entitle Betts–Lucas to judgment as a matter of law, then we must reverse and remand.

## II. FACTS

The events leading to Walter's death and Hartgrave's involvement are muddled and disputed by the parties. It is not disputed that his death resulted from asphyxiation due to a fractured larynx caused by trauma. Apparently Walter had upset Judy Fakes, Hartgrave's supervisor, because he drank a can of soda that Fakes had left unattended. The Commissioner contends that Fakes attempted to make Walter drink from a bottle of shampoo as punishment, and that Hartgrave struck Walter in the throat to get him to drink. Betts–Lucas takes the position that Fakes attempted to make Walter drink the shampoo while she was squeezing his throat; Hartgrave struck Walter on the throat in an attempt to get him to spit out the shampoo. The only direct evidence of the events in the summary judgment record is the transcript of Hartgrave's guilty plea. The transcript supports Betts–Lucas' characterization of the evidence. Hartgrave was charged and pleaded guilty on both direct and accessory theories of crim-

---

5. As we have observed before, summary judgment may not be the most efficient way to resolve a case where the parties agree as to the facts. Trial under Rule 73.01 upon a stipulation of facts is subject to a different standard of review than is summary judgment under Rule 74. *See Shelter Mut. Ins. Co. v. See*, 46 S.W.3d 65, 67 (Mo.App.2001). Summary judgment is not a substitute for trial and should not be utilized in that manner. Because of the silence of the record, we do not know the parties' intent in filing a joint stipulation of facts.

inal liability.[6]

Later that morning, as Walter exhibited problems eating and drinking, Fakes had him examined by the facility nurse. The nurse was not told of the trauma to Walter's throat, and she believed that the swelling was due to a minor illness. Had the nurse been aware of the trauma, she would have had Walter sent immediately to the hospital. Due to lack of further medical care, Walter died within the next two to four hours as a result of his injuries.

The parties do not dispute that Hartgrave's actions violated DMH rules. Hartgrave was subsequently terminated for his misconduct.

### A. The Wrongful Death Action

Betts–Lucas filed a wrongful death action on March 30, 1998, naming Hartgrave, Fakes, and Higginsville Habilitation Center as defendants. The petition alleged that Fakes and Hartgrave failed to summon emergency medical assistance for Walter and/or misrepresented to others that Walter did not need medical aid. A second count sought damages under 42 U.S.C. § 1983 for violations of Walter's civil rights.[7] Shortly after the suit was filed, private counsel for Hartgrave wrote to the Attorney General requesting a defense to the suit. After no response by the Attorney General, counsel for Hartgrave again wrote reiterating his demand for a defense in the action and indicating that, if no response was forthcoming, he would take steps himself to defend Hartgrave's interests. After the second letter, the Attorney General responded that the matter was under consideration and that

Hartgrave would be notified later. Hartgrave's counsel then requested a decision by October 1, 1998.

### B. The Henry County Declaratory Judgment Action

The response to the requests by Hartgrave's personal attorney for legal representation in the wrongful death action was to file a declaratory judgment action in Henry County on November 18, 1998. In that action, which named Hartgrave but not Betts–Lucas as a defendant, the Commissioner sought declaratory relief that Hartgrave's actions were not conduct arising out of his duties on behalf of the State and that Hartgrave was, therefore, not entitled to have any judgment paid from the Legal Expense Fund. Hartgrave's personal attorney filed an answer and counterclaim in the Henry County action and, by letter of December 16, 1998, indicated that his client intended to enter into a "Covenant to Limit Execution" in the wrongful death action unless the Attorney General agreed to "assume responsibility for the damages sought in the Petition and to provide him with a defense to that action." A copy of the proposed covenant with Betts–Lucas was enclosed. A response was requested by January 1, 1999.

### C. The Covenant to Limit Execution

The proposed agreement with Betts–Lucas required that Hartgrave extend cooperation to the Attorney General to attempt to secure its defense of the claim. Hartgrave denied any liability for the claim. Betts–Lucas agreed to seek recovery of a judgment against Hartgrave, if she ob-

---

6. It is unclear whether the autopsy distinguished between Fakes' squeezing and Hartgrave's blow to the throat as the cause of the larynx fracture.

7. This count was subsequently dismissed because it could only be brought by a personal representative of Walter's estate and the period for appointment of a personal representative had expired.

tained one, only against the Legal Expense Fund. The agreement was subject to approval of the court and required that Hartgrave give notice to the Attorney General of any trial in the wrongful death action, even if the Attorney General continued to refuse to defend him.

On January 6, 1999, the Attorney General responded to the December 16, 1998, letter saying that he was agreeable to providing representation in the wrongful death action through unidentified outside counsel but without agreeing that the claim was covered by the Fund or waiving the claims in the Henry County declaratory judgment action. On February 3, 1999, Hartgrave's counsel declined the offer of representation with a "reservation of rights," saying that his client "does not feel it in his best interests to have counsel ... provided to him by an agency that is disclaiming the ultimate liability for the effects of that defense." There is no indication that the Attorney General responded to that letter.

### D. Approval of the Covenant to Limit Execution

On April 9, 1999, Betts–Lucas sought approval of the Covenant to Limit Execution from the Lafayette County court. A copy of that pleading and a notice of hearing were sent to the Attorney General. The Attorney General was also advised that the matter was set for trial on April 20, 1999. Neither Hartgrave, his personal counsel, nor the Attorney General appeared on that day. The trial court proceeded to approve the covenant to limit execution and to hear evidence on liability and damages.

### E. The Wrongful Death Judgment

At the wrongful death trial, Betts–Lucas read from sworn statements by Fakes and Hartgrave. They disagreed on the sequence of events surrounding the soda and shampoo. Fakes denied that she tried to force Walter to drink the shampoo, but she testified that Hartgrave did and that he struck Walter several times in the throat. She testified that she had seen Hartgrave discipline other patients in this manner but had never written him up because other attendants did similar things. Hartgrave testified that Fakes held Walter by the throat and poured shampoo into his mouth until it dribbled out the sides of his mouth. He admitted that he struck Walter once under the chin. Both Fakes and Hartgrave agreed that later in the morning, when Walter began showing signs of distress noticed by other employees, neither of them told the other staff (and particularly the medical staff) of the incident. Another mental health employee was called as a witness who observed Walter's condition after the incident and confirmed that both Fakes and Hartgrave knew that Walter was having difficulty but said nothing about the incident. A registered nurse at the facility testified that she was asked to examine Walter but was given no history of the trauma. She said that if she had been, that she would have sent him to the hospital immediately or called the doctor. A little later that morning, she received a call from Fakes that Walter was having more trouble breathing. She called for an ambulance and found Walter in the shower being cleaned up by staff after he messed himself. His condition did not appear to be too serious when she saw him, and again she was given no history of the trauma. For those reasons she cancelled the ambulance. A few minutes later, his neck swelled up quickly and Walter quit breathing entirely. Resuscitation efforts were unsuccessful. Betts–Lucas also introduced medical testimony that Walter's death could have been easily avoided, if staff had disclosed the trauma and Walter had been given treatment, even several

hours after the incident. The court entered its judgment in favor of Betts–Lucas on April 27, 1999. On May 25, 1999, the Attorney General filed a motion to intervene in the wrongful death action, seeking that the judgment be set aside and the action stayed until the Henry County declaratory judgment case was finally decided. No explanation appears in the record why the Attorney General did not seek a stay or intervention before the judgment was entered. The court denied the Attorney General's motion the next day.

### F. The Judgment in Henry County

The Commissioner had filed a summary judgment motion in Henry County on March 15, 1999. Hartgrave opposed that motion and also filed a motion to dismiss, on the grounds that because Betts–Lucas was not a party and that under Rule 87.04:

> When declaratory relief is sought, all persons shall be made parties who have a claim or interest which would be affected by the declaration and no declaration shall prejudice the rights of persons not parties to the proceedings.

That motion also advised the Henry County Circuit Court that a final judgment had been entered in the Lafayette County death action and that Betts–Lucas had filed the declaratory judgment action in Cole County against the Commissioner seeking coverage for the judgment. The Henry County court, on November 5, 1999, granted the State's motion for summary judgment. The court found that, regardless of the differing descriptions of the incident, the actions of Fakes and/or Hartgrave constituted an assault and were the cause of death, rather than a failure to obtain medical attention for Walter Betts. The court also found that Hartgrave's acts were knowing and intentionally done and were not within the scope and course of his employment with the Department of Men-

tal Health. The court, therefore, declared that the Legal Expense Fund had no obligation to defend Hartgrave and that the Commissioner had no responsibility to pay any judgment in the Lafayette County action. No reference was made to the judgment already entered in Lafayette County or the other declaratory judgment action already pending in Cole County.

### G. The Cole County Declaratory Judgment Action

Betts–Lucas' declaratory judgment action against the Commissioner was filed on May 28, 1999. It alleged, *inter alia,* that the judgment in Lafayette County was based on Hartgrave's duty to summon medical assistance and that the failure was performed in connection with Hartgrave's duties on behalf of the State under § 105.711.2(2), RSMo. She further alleged that defense of Hartgrave had been tendered to the Attorney General but refused by him. The Commissioner filed an answer and stated the following affirmative defenses: (1) failure to state a claim; (2) official immunity to the extent that the petition named officials in their individual capacity; (3) sovereign immunity; (4) that the conduct of Hartgrave was not in the course and scope of his official duties on behalf of his employer because Hartgrave pleaded guilty to manslaughter and that collateral estoppel barred relitigating Hartgrave's conduct; (5) Hartgrave's rejection of a qualified defense by the Attorney General amounted to non-cooperation pursuant to RSMo § 105.716; and (6) the Lafayette County judgment was the result of collusion and was unreasonable in amount and that the collusion also constituted non-cooperation under § 105.716.

This lengthy recitation of the procedural and factual history leads us, finally, to the Commissioner's arguments why the Cole County court erred in entering summary judgment in favor of Betts–Lucas.

### III. POINTS ON APPEAL

The Commissioner presents three points on appeal. For his first point on appeal, the Commissioner contends that the trial court erred in granting summary judgment in favor of Betts–Lucas for two reasons. He argues that Hartgrave's conduct leading to the death of Walter "was not conduct arising out of or performed in connection with his official duties" because Hartgrave pleaded guilty to involuntary manslaughter. Alternatively, the Commissioner argues that there was a genuine dispute of material fact over whether Hartgrave's conduct was performed in connection with his official duties. The gravamen of his argument is that Hartgrave's assault upon the decedent was criminal conduct. He further suggests that state employees who commit criminal conduct do not fall under the protection of the Legal Expense Fund.

For his second point on appeal, the Commissioner alleges that the trial court erred in granting Betts–Lucas' motion for summary judgment because she failed to establish that the Commissioner's affirmative defenses were without merit. Specifically, the Commissioner claims that he is entitled to an affirmative defense based upon the non-cooperation of Hartgrave, due to his refusal to accept the offer of representation under a reservation of rights. The Commissioner also suggests that there was collusion between Betts–Lucas and Hartgrave, as evidenced by the covenant to limit execution and Hartgrave's failure to appear at trial to defend against Betts–Lucas' suit.

In his third point on appeal, the Commissioner alleges error because the trial judge refused to recuse himself from further reconsideration of the case based upon an appearance of impropriety. Specifically, the Commissioner suggests that such an appearance was created by the entry of judgment in favor of Betts–Lucas after the appeal in Betts–Lucas I and after independent litigation was brought against the Cole County judges by the Attorney General.

### IV. DISCUSSION

#### A. The Legal Expense Fund

The "State Legal Expense Fund" was established in 1983 to replace the former "Tort Defense Fund." § 105.711.2, RSMo, provides, inter alia:

> Moneys in the state legal expense fund shall be available for the payment of any claim or judgment rendered by a court of competent jurisdiction against:
>
> ... (2) Any officer or employee of the State of Missouri ... **upon conduct of such officer or employee arising out of and performed in connection with his or her official duties on behalf of the state** ...

(Emphasis added). Section 105.716 provides that "Any investigation, defense, negotiation or compromise of any claim covered by sections ... shall be conducted by the attorney general ..." (except for certain specified agencies not germane here). Subsection 2 of that statute further requires "coopera[tion] with the attorneys conducting any investigation and preparing any defense" and prohibits payment of claims or judgments against agencies or employees who do not cooperate.

The central case interpreting the Legal Expense Fund statues is *Dixon v. Holden*, 923 S.W.2d 370 (Mo.App.1996) (hereinafter "*Dixon I*"),[8] authored by Judge Lowen-

---

8. There was a subsequent appeal of the *Dixon* matter which involved the issue of whether the Fund was liable for the award of attor-

ney's fees made to the plaintiff in the federal court action. We held that the attorney's fees, authorized by 42 U.S.C. § 1988 were

stein. *Dixon I* concerned a plaintiff's declaratory judgment action seeking a ruling that the Legal Expense Fund was responsible for payment of a judgment the plaintiff had obtained in federal court against two fellow highway patrol officers, who had illegally tapped the plaintiff's work phone. The federal suit was settled for the amount of $225,000, and the parties agreed that execution would be taken solely against the Legal Expense Fund. The declaratory judgment action was resolved by a grant of summary judgment in favor of the plaintiff, finding that the Legal Expense Fund was liable for the judgment against the defendant officers.

On appeal, this court made several significant holdings. First, we held that a judgment creditor has standing to seek recovery from the Legal Expense Fund, even if the Fund is not involved in the underlying litigation that fixes liability. *Id.,* at 377–78. Second, we held that the doctrine of sovereign immunity was not available as a defense by the State to actions seeking recovery from the Fund, given that the underlying litigation is against state employees, rather than the state itself. *Id.* at 379. Third, the court rejected the State's suggestion that Fund coverage was limited to those situations in which the state employee's actions, even though negligent, were still in good faith. *Id.*

*Dixon I* also addressed the requirement that the Fund provide representation to state employees sued by plaintiffs seeking tort liability. The court recognized that the purposes of the statute could be defeated if the Attorney General refused to defend state employees. Nevertheless, we also conceded that the Attorney General

"must be allowed the ability to opt out of the defense of cases and save limited staff resources, where the requisite facts for state involvement do not or will not ever be met." *Id.* at 380. This court was troubled by the statute's failure to establish a line or, at minimum, guiding principles to determine whether the Attorney General had a duty to defend an employee.

During our review, we articulated four questions left unresolved by the Legal Expense Fund statutes:

1) Will conduct by the employee resulting in punitive damages be defended?

2) What if there is criminal conduct by the employee? [9]

3) Where the defense of official immunity will trump the plaintiff's suit, must the attorney general still defend?

4) Where the conduct appears to be involved in a ministerial function and no cloak of official immunity looks possible, may the attorney general ever opt out and prevent the state from ever becoming involved in the suit?

*Id.* In discussing the Attorney General's decision to defend a state employee, we opined that "the better practice would be ... to err on the side of entering too many defenses rather than sitting out of the suit and later having to come into a suit in the posture of the case at bar." *Id.* An appropriate approach, we held, would be to analogize the Attorney General's discretion to that of "an insurer reviewing a complaint to determine if a defense must be provided." *Id.* We also invited the legislature to remedy the ambiguities within the statute, identifying five separate areas that needed clarification. *Id.* at 380–81. Despite the passage of nearly six years, though, the

---

properly recoverable from the Fund. *Dixon v. Holden,* 963 S.W.2d 306 (Mo.App.1997) (hereinafter *"Dixon II "*)

**9.** Betts–Lucas argues that the officers' conduct in *Dixon I* was actually criminal, but it does not appear that this contention was actually raised in *Dixon I.*

legislature has not taken any steps to address the questions raised in *Dixon I.*

### B. Did Hartgrave's Conduct Arise Out of His Official Duties?

■ In his first point on appeal, the Commissioner suggests that we should resolve the question of whether an employee who commits criminal conduct falls within the protection of the Legal Expense Fund. He contends that criminal conduct cannot be, as a matter of law, conduct arising out of a state employee's official duties. In the alternative, the Commissioner argues that there was at least a dispute of material fact regarding whether Hartgrave's conduct arose from his official duties. If we conclude that either argument is correct, then we must reverse the judgment below.

■ The Commissioner, therefore, urges us to begin with the question of whether a "criminal conduct" exception should be read into the Legal Expense Fund statutes, relieving the Attorney General of a duty to defend state employees who commit criminal acts. Betts–Lucas counters that, in essence, the Attorney General is asking us to rewrite the statute and usurp the legislative function. "[W]hen the language of the statute is unambiguous and conveys a plain and definite meaning, 'the courts have no business foraging among ... rules [of construction] to look for or impose another meaning.'" *In re Estate of Thomas,* 743 S.W.2d 74, 76 (Mo. banc 1988) (quoting *DePoortere v. Commercial Credit Corp.,* 500 S.W.2d 724, 727 (Mo.App.1973)). We cannot prefer a policy different from that promulgated by the legislature. *Kearney Special Road Dist. v. County of Clay,* 863 S.W.2d 841, 842 (Mo. banc 1993). Where a statute incorporates no exception, a court should not insert one by judicial legislation. *Poling v. Moitra,* 717 S.W.2d 520, 522 (Mo. banc 1986). In *Dixon I,* we refused to

rewrite into the statute an implied good faith requirement urged by the Attorney General. *Dixon I,* 923 S.W.2d at 379. And in *Dixon I,* we expressly noted that there was no criminal conduct exception and the legislature, if it desired a policy favoring one, should reconsider the Fund statute. *See id.* at 380. Nor has the conduct of the Attorney General in other cases involving the issue of Fund coverage been consistent with the criminal conduct exception now sought. *Hankins v. Finnel,* 759 F.Supp. 569 (W.D.Mo.1991), *aff'd,* 964 F.2d 853–854 (8th Cir.1992) (Fund's voluntary payment of actual and punitive damages for judgment entered against a prison employee who repeatedly sexually molested an inmate).

At oral argument, the Attorney General took the position that, under such a criminal conduct exception, the Fund would not cover a state employee driving a state vehicle on state business who was under the influence of alcohol and charged with vehicular homicide following an accident. But the Attorney General then conceded that it would probably choose to defend and cover a civil suit for damages against a patrol officer who used excessive force in an arrest and was charged criminally for such force. Essentially, the Attorney General argues that we should engraft a criminal conduct exception into the statute but allow him to exercise his judgment as to when it should apply. We see nothing in the Fund statute that grants the Attorney General the discretion to determine when coverage applies and we will not extend him the discretion the legislature denied. The plain language of the statute provides coverage for conduct of an employee "arising out of and performed in connection with his or her official duties." § 105.711.2(2), RSMo. Under the language of the statute, as written, that conduct by a state employee may also be criminal is important for Fund coverage only to the

extent that the criminal charge demonstrates the conduct to have no relationship to the employee's official duties. The record below reflects that it was undisputed that the Department of Mental Health authorized employees to use reasonable force to manage the residents. But the use of excessive force against residents of a mental health facility is made a crime under § 630.155.1(3), RSMo.

Moreover, that issue is not squarely before this court. The wrongful death judgment against Hartgrave was not premised upon his involvement with the assault against the decedent. Instead, liability was established on the basis of Hartgrave's failure to obtain appropriate medical treatment for the decedent. The Attorney General's claim that, as a matter of law, there is no Fund coverage whenever the state employee is convicted of a crime is denied.

### C. Was There a Material Issue of Fact Remaining?

■ The Commissioner also argues that there was a dispute of material fact as to whether Hartgrave's actions arose out of his official conduct. The Commissioner does not specify in his point on appeal the alleged material fact(s) that preclude summary judgment. In the argument section of his brief, he claims that there remains "a genuine issue of fact regarding *the nature* of Hartgrave's conduct."

Respondent's argument is somewhat difficult to follow because Betts–Lucas' motion for summary judgment was presented upon a joint stipulation of facts. The stipulation provided that "the following facts are admitted and not in dispute." The Commissioner's response to the motion for summary judgment did not set forth any additional facts beyond those included in the stipulation. The Commissioner's own cross-motion for summary judgment relied upon the same joint stipulation of facts utilized by Betts–Lucas. In its response to her motion, the Commissioner does include several denials of paragraphs in Betts–Lucas' motion. His brief, however, does not reference those denials. We have foraged through the response on our own, attempting to determine whether the denial of any factual allegations creates the genuine issue of material fact claimed by the Commissioner. That effort has been unsuccessful.

Both the denials and the argument portion of the Commissioner's brief argue not the existence or non-existence of a fact or factual dispute but rather the legal effect and consequence of the stipulated facts. That the parties disagree on the legal consequences of a particular set of facts does not create a "fact" issue precluding summary judgment. *See Seymour v. Lakewood Hills Ass'n,* 927 S.W.2d 405, 407 (Mo.App.1996). The Commissioner specifically refers to the DMH policy prohibiting use of excessive force by employees. Betts–Lucas does not dispute that policy or Hartgrave's violation of the policy. The Commissioner suggests, in a footnote without citation to specific legal authority or persuasive logic, that any time a state employee acts in contravention of a policy or regulation of his agency, coverage under the Fund should be denied because it is never within the scope of the employee's official duties to violate a regulation or policy of his employer. Again, this contention has nothing to do with the point on appeal claiming a fact issue in dispute. Addressing that undeveloped contention entails ignoring the requirements of Rule 84.04. We will not abandon the dictates of that rule.

The Commissioner's argument, however, focuses again upon the assault instead of the subsequent failure to obtain proper medical treatment for the decedent. It

was not disputed that Hartgrave, as a DMH employee, had a duty to obtain appropriate medical treatment for those residents of DMH facilities that were under his care. The failure to satisfy that duty clearly constitutes conduct arising out of Hartgrave's official duties.

In the argument section in support of his first point on appeal, the Commissioner raises several additional arguments. The Commissioner contends that by pleading guilty, Hartgrave admitted that his conduct was criminal. He also contends that the Cole County trial court was bound by the Henry County declaratory judgment. The Commissioner also argues that he was not bound by the wrongful death judgment because he was not a party to that action. None of these latter arguments are encompassed by the stated point on appeal, and, thus, will not be taken up by this court. Rule 84.04(e).

The Commissioner has failed to show that Hartgrave's conduct fell within an exception to the Legal Expense Fund statutes or that there was a genuine dispute of material fact regarding that issue. As such, the Commissioner's first point on appeal is denied.

### D. Did the Motion for Summary Judgment Overcome the Commissioner's Affirmative Defenses?

The Commissioner's second point on appeal alleges that the trial court erred in granting Betts–Lucas' motion for summary judgment because it failed to defeat his affirmative defenses. The Commissioner's answer set out several affirmative defenses, including non-cooperation of Hartgrave under § 105.716, RSMo, collusion and unreasonableness of the damage judgment awarded Betts–Lucas, sovereign immunity and official immunity. Again the Commissioner's point on appeal is deficient because the point makes no reference

to any specific affirmative defense. Nevertheless, we have reviewed the argument potion of his brief and believe that we can discern the affirmative defenses referred to by the point on appeal and understand his arguments. *See Meco Sys. Inc. v. Dancing Bear Entm't, Inc.*, 42 S.W.3d 794, 801 (Mo.App.2001). The first affirmative defense is the allegation that Hartgrave was not entitled to Legal Expense Fund coverage due to his non-cooperation as required by § 105.716, RSMo.

Preliminarily, we must agree that the trial court misstated the standard for its evaluation of the affirmative defenses relating to summary judgment. The trial court erroneously indicated that the burden was on the Commissioner to demonstrate the existence of viable affirmative defenses. For purposes of summary judgment Betts–Lucas must first establish that any affirmative defenses raised are without merit as a matter of law. *ITT Commercial Fin.*, 854 S.W.2d at 381. Yet after the claimant has negated an element of an affirmative defense, it is the obligation of the non-movant to come forward and show that there is a genuine issue of fact as to the affirmative defense. *Id.* Nevertheless, if we conclude that the trial court reached the right result, albeit for the wrong reason, we will affirm the court's action. *Goforth v. Mo. Dep't of Corr.*, 62 S.W.3d 566, 568 (Mo.App.2001).

#### 1. Non–Cooperation Defense

■ The Commissioner contends that the Legal Expense Fund should be relieved from its duty to defend and indemnify Hartgrave due to his non-cooperation regarding the defense of the wrongful death action. That lack of cooperation, he contends, took two forms. First, it is argued that Hartgrave failed to cooperate by refusing the Fund's offer to defend him under a reservation of rights. Second, the

Commissioner claims that Hartgrave also failed to cooperate by entering into a covenant to limit execution with Betts–Lucas.

The Commissioner relies upon *Dixon I* as authorizing the Attorney General to defend an employee under a reservation of rights. That argument fails to recognize that the cited passage in *Dixon I* suggested that the legislature revise the Legal Expense Fund statutes to include such a provision. *See Dixon I*, 923 S.W.2d at 380–82. The General Assembly never took such action. As such, there remains no statutory authority for the Attorney General to defend a state employee under a reservation of rights.

Absent such authority, the Attorney General presents no persuasive argument why Hartgrave was required to accept such a defense. Even the Attorney General recognized his potential conflict of interest in his letter to Hartgrave's attorney, indicating an intent to find outside counsel. Yet in the four months between that letter and the trial of the wrongful death claim and despite the Attorney General's knowledge of the trial setting, no such attorney ever appeared or was identified. Nor did the Attorney General attempt to intervene and claim any right under the Fund statute to provide the defense for Hartgrave. Given the absence of any statutory authority for the Attorney General to defend Hartgrave under a reservation of rights, we conclude that the declination of the Attorney General's offer did not constitute non-cooperation under § 105.716.2, RSMo.

■ This takes us to the next issue posed by the Commissioner, which is whether Hartgrave's actions in entering into the covenant to limit execution and failing to contest Betts–Lucas' evidence at the damages hearing constituted non-cooperation. In the insurance context, similar arrangements are authorized under § 537.065, RSMo. (expressly authorizing limiting execution to specified assets or insurance coverage).

The inquiry, then, is whether Hartgrave improperly colluded with Betts–Lucas in entering into the covenant to limit execution and whether the amount of the wrongful death judgment was unreasonable. The Commissioner points to the procedural events surrounding the wrongful death judgment in support of his argument that Hartgrave and Betts–Lucas colluded to the disadvantage of the Legal Expense Fund. Specifically, after the execution of the covenant to limit execution, Hartgrave failed to appear for trial on the issue of liability and damages.

Relying upon *Whitehead v. Lakeside Hospital Ass'n*, 844 S.W.2d 475 (Mo.App. 1992), the Commissioner argues that Hartgrave's failure to contest Betts–Lucas' evidence establishes that collusion took place. In *Whitehead*, the insured entered into an agreement with the plaintiff under § 537.065, RSMo. *Id.* at 477. As part of that agreement, the insured agreed to forego its defense to the suit, presenting evidence at trial, the cross-examination of witnesses, motions for new trial, or appeal. *Id.* The insurer claimed that this agreement was collusive in nature. Contrary to the Commissioner's suggestion, this court never reached that issue. Instead, we held that it was not properly raised upon a motion to intervene in the tort action. *See id.* at 481–82. Rather, the proper place for the insurer to litigate that issue was through a declaratory judgment action regarding coverage or separate litigation brought by the tort plaintiff seeking payment under the insurance policy. *Id.*

This court has held that an insured, faced with a refusal of a defense by their insurer, "is justified in reaching a settlement which enables the insured to be released from personal liability." *Rinehart*

v. *Anderson,* 985 S.W.2d 363, 371 (Mo.App. 1998).[10] Indeed, "An insured, 'although not engaging in collusive conduct for fraudulent or deceitful purpose, may act in a self-interested way in an attempt to protect himself from personal liability.'" *Id.* (quoting *Gulf Ins. Co. v. Noble Broad.,* 936 S.W.2d 810, 816 (Mo. banc 1997)). In *Dixon I* we rejected an argument that a consent judgment (which was not the case here) constituted collusion. 923 S.W.2d at 379. The Commissioner and Attorney General make no persuasive argument about why we should characterize what *Dixon I* says is not collusion as non-cooperation. Most importantly, although the Commissioner criticized as non-cooperation Hartgrave's failure to attend the trial and testify or cross-examine witnesses, he fails to indicate any specific testimony or cross-examination that could have been provided to dispute Betts–Lucas' evidence at trial.

■ There appears to be no genuine dispute on the issue of whether Hartgrave was properly held liable regarding the decedent's death. Instead, the Commissioner directs his argument towards the reasonableness of the damage award. In *Gulf Insurance Co. v. Noble Broadcast,* 936 S.W.2d 810 (Mo. banc 1997), the Supreme Court recognized that an insurer has the right to dispute the reasonableness of a § 537.065 settlement in subsequent litigation to recover against the insured's policy. *See id.* at 815–16. The insurer, however, bears the burden of showing that the settlement is unreasonable. *Id.* at 816. The settlement amount will be held to be reasonable if it is an amount that "a reason-

ably prudent person in the position of the defendant would have settled for on the merits of the plaintiff's claim." *Id.* Despite the Commissioner bearing the burden at trial on this issue, Betts–Lucas may obtain summary judgment regarding this issue by showing that there is no genuine dispute of material fact regarding the reasonableness of the settlement amount.

In the wrongful death action, judgment was entered against Hartgrave in the amount of $302,668.15 in compensatory damages[11] and $500,000 in damages for aggravating circumstances under § 537.090, RSMo. The wrongful death court also made specific findings regarding the reasonableness of the settlement with Hartgrave limiting collection to assets other than Hartgrave's. The Commissioner suggests that there was no evidence that the decedent had any significant pain or suffering. The sections of the trial transcript cited in support of that statement appear to contain no testimony regarding that issue, however.

The Commissioner also argues that the decedent "was extremely limited verbally so the value of lost companionship was certainly open to question." His argument here is repugnant, in that it suggests that if a person has limited means of verbal communication, then his family has no cause to seek non-economic damages if they are wrongfully deprived of that person's companionship. It ignores that the determination of non-economic damages to the decedent's family "include[s] the physical, emotional, and psychological relationship" between the decedent and his surviv-

---

10. In *Rinehart,* the insured agreed to the entry of a default judgment with regard to liability, and a separate trial was held on the damages issue in which both the plaintiff and the insured presented evidence. The propriety of this procedure was not disturbed on appeal. *See generally id.*

11. $2,668.15 was awarded for economic damages (funeral expenses), $200,000 was awarded for the decedent's non-economic damages, and $100,000 for the survivors' non-economic damages.

ors. *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 176 (Mo.App.1997).

Beyond these two somewhat distasteful arguments, the Commissioner does nothing more than argue that his opinion of the value of Betts–Lucas' wrongful death claim is different than the trial judge who heard the evidence. The Commissioner points to no evidence or document suggesting that the trial court in the wrongful death action did anything more than view the evidence as an impartial judicial officer and make his own best judgment as to the amount of damages. In fact, the damages awarded were substantially less than requested by Betts–Lucas. Most importantly for our purposes, however, is that the judgment was entered upon liability and damages after a trial and not as a result of a settlement. No affirmative evidence has been presented in opposition to Betts–Lucas' motion disputing the compensatory damages in the wrongful death action. As such, the Commissioner presented no genuine dispute of material fact. Under such circumstances, the rule of *Gulf Insurance. Co., supra,* does not allow the relitigation of the reasonableness of the judgment.

 The Commissioner also challenges the reasonableness of the "punitive damages" awarded against Hartgrave. Again, we note that the judgment did not award "punitive" damages and, in fact, such damages would not, as such, be allowable in a wrongful death action. Instead, § 537. 090 allows the award of damages for "aggravating circumstances" in a wrongful death claim. Although aggravating circumstances damages and punitive damages are treated as akin for purposes of the burden of proof instruction (M.A.I. 3.01; *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996)), the Commissioner makes no argument that damages for aggravating circumstances in a wrongful death case cannot be recovered from the Fund. We express no opinion on the liability of the Fund for punitive damages or aggravating circumstance damages in a wrongful death case.

Rather, the Commissioner limits his argument to a contention that the aggravating circumstances damage portion of the award was unreasonable. Again, the Commissioner fails to point to any specific evidence or error but merely seeks to disagree with the wrongful death court's evaluation of the evidence. Nor does the Commissioner point to any "mitigating circumstances" that might be presented under § 537.090 to question the award. The Commissioner suggests that Hartgrave's conduct was not unreasonable because the decedent was not in any immediate distress after the assault and he believed that his supervisor would contact a nurse. While these allegations are made in the Commissioner's response to the motion for summary judgment, a casual reading of that response reveals that the Commissioner failed to make any citation to evidence in the record supporting these claims. Such citation is mandatory under Rule 74.04(c)(2). Having failed to do so, the Commissioner failed to show a genuine dispute of material fact regarding the propriety of the damages awarded for aggravating circumstances. The Commissioner does not point to any lack of evidence of justifying aggravating circumstances damages, and, in fact, our review of the record indicates that the wrongful death court explicitly applied the higher burden of proof for such damages required by *Rodriguez.*

Betts–Lucas made an adequate showing that there was no genuine dispute of material fact regarding the reasonableness of the damages awarded in the wrongful death action. We also hold that the Commissioner failed to show that there was a genuine dispute of material fact regarding

the non-collusive nature of the covenant to limit execution.

### 2. Immunity Defenses

In the second portion of his second point on appeal, the Commissioner asserts that Betts–Lucas' motion failed to overcome his asserted defenses of official and sovereign immunity. In those defenses, he argues that he is immune from suit in this action due to the doctrines of official and sovereign immunity.

 The doctrine of official immunity insulates state employees from suit in their individual capacities when liability arises from discretionary acts or omissions of a state employee. *See Kanagawa v. State by and through Freeman,* 685 S.W.2d 831, 835 (Mo. banc 1985). On the other hand, if liability flows from a state employee's failure to perform a ministerial duty, official immunity will not bar suit against the employee. *Id.* Sovereign immunity, if not waived, bars suits against employees in their official capacity, as such suits are essentially direct claims against the state. *See Edwards v. McNeill,* 894 S.W.2d 678, 682 (Mo.App.1995). For the Commissioner to prevail, we must find that both defenses survived Betts–Lucas' motion for summary judgment.

 Regarding official immunity, the line between a discretionary and ministerial duty is not clearly demarcated, however. It depends upon the nature of the act and "the degree of reason and judgment required." *Id.* at 681. Generally, "a discretionary act requires 'the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued.'" *Id.* (quoting *Rustici v. Weidemeyer,* 673 S.W.2d 762, 769 (Mo. banc 1984)). A ministerial duty is one that is of "a clerical nature" requiring that the employee "perform upon a given state

of facts: ... in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Rustici,* 673 S.W.2d at 769. Ultimately, deciding whether an act falls within a discretionary or ministerial duty, "must be determined by the facts of each particular case after weighing such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity." *Kanagawa,* 685 S.W.2d at 836.

 Again, the Commissioner does not raise the question of whether Hartgrave was immune from suit in the underlying wrongful death action due to the official immunity doctrine. Instead, the Commissioner argues that *the Commissioner* is rendered immune from suit in the present action because of the official immunity doctrine. We are not convinced that the Commissioner is entitled to such immunity for two reasons. First, it does not appear that the Commissioner has been sued in his individual capacity. Instead, he has been sued in his official capacity as the Commissioner of Administration. As such, the official immunity doctrine has no application to the Commissioner. To the extent that the Commissioner might be deemed to be sued in his individual capacity, the official immunity doctrine would not apply, given that the Legal Expense Fund statutes impose a mandatory duty to pay judgments against employees arising out of connected to their official duties.

 Turning to sovereign immunity, we refuse the Commissioner's argument upon the basis articulated in *Dixon I.* The legislative provisions creating the Legal Defense Fund constitutes "a voluntary as-

sumption of defense and payment of judgments or claims against state employees sued for their conduct arising out of and performed in connection with official duties on behalf of the state." *Dixon I*, 923 S.W.2d at 379. As such, this court observed that "[t]he doctrine of sovereign immunity is not an issue" in a claim by a plaintiff seeking recovery from the Legal Expense Fund. *Id.*

Neither of the immunity defenses asserted by the Commissioner have merit. As noted above, the Commissioner's affirmative defenses regarding non-cooperation do not prevail as a matter of law. The trial court properly found that these affirmative defenses provided no bar to the entry of summary judgment in favor of Betts–Lucas. Accordingly, the Commissioner's second point on appeal is denied.

### E. Conflict of Interest

For his last point on appeal, the Commissioner contends that the trial judge should have recused himself from consideration of the case because he was a named defendant in a separate *quo warranto* action brought in Osage County by the Attorney General against him and the other Cole County judges. The motion for recusal was not filed until after the court entered summary judgment against the Commissioner and Attorney General. The separate action concerned the circuit court's maintaining jurisdiction over certain receivership funds paid into court that had gone unclaimed for more than five years. The Commissioner argues that that separate litigation rendered the trial judge potentially eligible for Legal Expense Fund coverage. As such, the Commissioner contends, it created an appearance of impropriety for the trial judge to rule upon the disputed Legal Expense Fund coverage issues in the present matter.

The Commissioner also argues that the procedural history of this action evidences bias on the part of the trial judge. As noted above, the trial court's original judgment was in favor of the Commissioner. This court reversed that judgment and the cause was remanded to the trial court for further proceedings. After remand, the trial court entered judgment in favor of Betts–Lucas upon the parties' stipulation of facts and Betts–Lucas' renewed motion for summary judgment. The Commissioner suggests that the trial court's different ruling on the issues shows that the trial court was biased against him.

■■■■■ A denial of a motion for recusal for cause is to be affirmed unless that denial constituted an abuse of discretion. *Robin Farms v. Bartholome*, 989 S.W.2d 238, 245 (Mo.App.1999) (citing *State ex rel. Bates v. Rea*, 922 S.W.2d 430, 431 (Mo. App.1996)). An abuse of discretion is committed if the trial court's decision defies logic under the circumstances, is sufficiently arbitrary and unreasonable to shock the conscience of the court, and exhibits a dearth of careful consideration. *Id.* Put another way, if reasonable persons would disagree regarding the appropriateness of trial court's decision, we must affirm. *Id.*

Betts–Lucas first replies that the motion for recusal was untimely under § 508.120, RSMo. Specifically, she points out that the motion for recusal was not filed until approximately six months after the Attorney General became aware of the claimed potential conflict issue in February 2001. The statutory section cited, however, was superceded by Supreme Court Rule 51.05. *State ex rel. Ferguson v. Corrigan*, 959 S.W.2d 113, 115 (Mo. banc 1997). Under the current rules of civil procedure, a motion for change of judge for cause may be made at any time. *Robin Farms*, 989 S.W.2d at 245.

This leaves us with two questions to resolve. First, did the second judgment show that the trial judge was biased against the Commissioner and his counsel, the Attorney General? Second, did the trial judge have an interest in the case before him that required his recusal?

■ In analyzing the first question, the Commissioner clearly mistakes the significance of the remand in this matter. The cause was reversed because the trial court had no procedural basis (*i.e.*, no cross-motion for summary judgment) upon which it could grant summary judgment in favor of the Commissioner. We did not reach the merits of the Commissioner's arguments. Nevertheless, the Commissioner suggests that by not discussing the merits, we approved of his claim to judgment. He fails to realize that we did not (and, indeed, could not) take any position with regard to the merits of the matter, having no jurisdiction to determine that issue.

Upon remand, the judgment below became a nullity, given that the judgment was reversed as a whole. *See Serafin v. Med 90, Inc.*, 963 S.W.2d 362, 363 (Mo. App.1998); *Breece v. Jett*, 583 S.W.2d 573, 574 (Mo.App.1979). As this court had not rendered any opinion regarding the merits of Betts–Lucas' claim, the trial court was free to revisit her claim to judgment upon her renewed motion for summary judgment. It was in no way bound by the prior vacated judgment. The fact that Betts–Lucas prevailed after remand presents no credible evidence of bias on the part of the trial court.

■ With regard to the second question, the Commissioner also argues that the trial judge should have recused himself because of an appearance of impropriety. Specifically, he argues that the trial judge had an interest in the action because it dealt with an issue that was potentially present in the Attorney General's quo warranto action against the Cole County judges: the extent and scope of coverage by the Legal Expense Fund.

Supreme Court Rule 2.03, Canon 3 provides a nonexclusive list of factors to be considered by a judge in determining whether recusal is appropriate. Canon 3E(1)(c) indicates that recusal is proper if a judge "has an economic interest in the subject matter in controversy or in a party to the proceeding, or has any more than a de minimis interest, that could be substantially affected by the proceeding." Similarly, Canon 3E(1)(d)(iii) requires disqualification if a judge has "more than a de minimis interest that could be substantially affected by the proceeding." The Commissioner appears to rely on one or both of these portions of Canon 3 in support of his claim that the trial judge should have recused himself.

■ Both of these portions of Canon 3 show that recusal is not necessarily required merely because a judge has an interest in an issue involved in the litigation at bar. Indeed, disqualification is required when two factors are present. First, the interest must be more than a de minimis interest. A merely theoretical interest in the issue at bar is insufficient. For example, every trial and appellate judge in the state could theoretically have an interest in the extent of Legal Expense Fund coverage. One would not argue, however, that this entails that every judge in Missouri must disqualify themselves from this case. There is no indication in the record whether the trial judge has sought to recover his legal expenses in the Osage County action from the Legal Expense Fund.

Second, the judge's interest must be substantially affected by the outcome of the proceeding before the court. It is this

second factor which shows the flaw in the Commissioner's argument. Regardless of how the trial judge ruled, it would have no impact on whether or not he might be eligible for Legal Expense Fund coverage in the *quo warranto* action pending in Osage County. The trial court's ruling is not binding on the Fund, nor is it binding on the Osage County court. Simply put, the trial judge's actions in the case would have *no* impact on whether or not he would receive Legal Expense Fund coverage, if requested, in connection with the suit filed against him by the Attorney General.

The Commissioner has failed to show that the trial court abused its discretion in denying his motion for recusal. None of the express provisions of Canon 3 are triggered by the factual circumstances before the trial court. Nor does the Commissioner make a convincing argument that recusal was nevertheless required under the circumstances. Given that reasonable persons could agree with the judge's reasoning in denying the Commissioner's motion, there has been no abuse of discretion. The third point on appeal is denied.

## V. CONCLUSION

The Commissioner has failed to show that the trial court erred in granting Betts–Lucas' motion for summary judgment. The Commissioner failed to show a genuine dispute of material fact concerning whether Hartgrave was covered by the Legal Expense Fund or regarding any of the Commissioner's affirmative defenses. Likewise, the Commissioner does not present a meritorious argument that the trial judge abused his discretion in denying his motion for recusal.

Finding no error in the proceedings below, the judgment of the trial court is hereby affirmed.

HAROLD L. LOWENSTEIN, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.